May it please the court, my name is Marina Serebryna representing Tunzi Kacso, the petitioner. Substantial evidence in Ms. Kacso's application compel reversal of the board's decision and compel finding of past persecution, thus giving rise to the presumption of future. Ms. Kacso filed her application on June 15, 2001, nearly seven years today, and long before Real ID Act. So in the context of a pre-Real ID asylum applications, the board erroneously upheld adverse credibility findings relying on minor inconsistencies and minor discrepancies that do not pertain to the heart of Ms. Kacso's claim. Well, the question of the mailing of the tape goes right to it because she contended that one of the bases for her persecution was trying to get information about the tape, and yet she says she sent it to an address that didn't exist, to a station that didn't exist at that time. Your Honor, the question came up as to whether Ms. Kacso remembered the exact street address, and significantly that question came up on cross-examination. She may or may not be correct on the street address. The record, however, shows that she did not address the tape. But the station didn't exist. She explained this discrepancy very plausibly by saying that there was a Hungarian TV station in Budapest where she sent the tape, and although she couldn't personally vouch for the exact name or the exact street address, she believed that the pre-addressed package did in fact go to a Hungarian TV station. We might be able to say, yes, that's one plausible explanation, but as we've just discussed, isn't the test, was there a basis for the IJ's determination? And wasn't the IJ, can you say that there was essentially no basis for the IJ to determine adverse credibility in part on that? This particular discrepancy doesn't go to the heart of her claim, Your Honor, because she was persecuted, not so much for the tape having reached whatever destination, but for having sent it. What Kacso testified… Doesn't the declaration that came from, I've forgotten the name of the individual who purportedly gave it to her to send… Istvan Frakas. He doesn't reference the address or anything else. There's nothing to corroborate that it was sent to any station. And the only evidence was she said it was sent to Duma, whatever the name of the station was, which didn't exist in 1990, didn't exist until 1992, wasn't at that address until 1994. And there was, I don't recall, and correct me if I'm wrong, that there was any information about any other station that was broadcasting that was the subject of a police investigation, was there? What Frakas' declaration shows, Your Honor, is that there was a station, and in fact, yes, you are correct, the Frakas declaration does not call a station by its name nor refer to the street address. Of course, his declaration was provided before she testified and without anticipating this particular discrepancy. It may very well be relevant to this confusion that Frakas and Petitioner Kasho met in 1995, when, after Frakas got back from Sweden where he found asylum. And when they met in 1995, if Frakas' declaration is to be considered, at that time, Duma TV existed. So a mere substitution of what was that station then could have been a very plausible reason for Kasho to make a mistake. But what's more important, I think, is that her trouble, even if this particular event is, in fact, a pivotal point in her history of persecution, that comes because she sent the tape out and when the police came to her. Couldn't the I.J. have concluded, given that there was no evidence of a station, given that the address didn't exist, given that the station didn't exist, was the I.J. unreasonable in, can we say the I.J. couldn't have concluded that there was no tape? Your Honor, she testified in great detail to the circumstances of her first interrogation in her workplace when there was no clarity in the eyes of the police as to what they were looking for. And apparently they were, in fact, looking not for her but for Istvan Frakas. And then the police came to the workplace the second time, now looking for Ms. Kasho. That testimony, very detailed, seems very credible and sufficient to satisfy the I.J.'s doubt as to whether or not she was correct specifically on the issue of the address. Very much like in other cases in this court, discrepancies that do not go to the heart of the claim do not permit I.J. make adverse credibility findings. But that's really kind of, that's the question here is how, she says I sent this tape and the cause and effect is then the police show up and we have this persecution. So the real question would be then, well, did she send the tape? She says I sent the tape. And to test that credibility, well, where did you see, she testified as to the details surrounding the sending of the tape. And the question then becomes does, do the details about where and how she sent it become central to whether she sent it? That seems to me to be the issue that the I.J. focused on. And I think that in addressing this issue, I.J. overlooked a great deal of details that actually corroborate her testimony. She testified that her former colleague and friend, Istvan Frakas, videotaped the riotous events of March the 20th. That he was under surveillance and he was afraid to send the tape out himself. He gave it to her because her business had a number of packages going abroad so it was an easy situation for her to use and send one more package that wouldn't be related to the business. All those things are in fact corroborated by Frakas' declaration as well. But he doesn't corroborate what station. He doesn't clarify how it was addressed. It couldn't have been addressed as she testified. And one would think, and I think the I.J. had, doesn't the I.J. have some right to expect that when that came out, that if there was indeed another station that had been broadcasting in Romania, and as my understanding is some of these stations were underground and it was very hard to broadcast, that she would have identified and said, oh, well, it was this station. I knew it was broadcasting. That's probably where it went. But there's no indication even after she was confronted with that issue of, okay, then it didn't go there. Here's where it must have gone. There's nothing on that. It's totally silent, as is his declaration. That would have corroborated at least there was some place the tape might have gone had it been sent, and she might have just been mistaken. But without that, can we say the I.J. was? I think that's what she's saying, that there was a Hungarian station where she sent the tape, that she's not sure whether Duna TV at that point was in the stage of formation or not, but there was a station there. And, in fact, that seems very plausible. In a post-Soviet, if you will, or post-Warsaw Pact world, free enterprises, a new form of media do not really spring up out of nowhere. There has been some form of TV station, a broadcasting enterprise that might have been used, and if we believe Fraka's declaration was eventually used to broadcast the bloody event in Tigromoros. It's also important to see this record as a whole and remember that this particular event is not the sole event in the long history of persecution that Tunde Kasia suffered in Romania on account of her Hungarian descent and her membership in the UDMR, the Union of Democratic Hungarians in Romania. Counsel, Judge Gould, could you please address a little bit the significance of that party later being in the majority coalition? The BIA and the IJ thought there was significance that that human rights organization or party later came into a majority coalition. So then the question is, if she was to some degree harassed for politicking with it, is there any reason to think she's in trouble if she goes back? Yes, Your Honor, and that question has been addressed squarely by this court in Shaw where it's held that political gains, electoral gains of a political party do not in fact contradict individual risks and do not come as necessarily inconsistent with possibilities of individual persecution. And perhaps Petitioner Ms. Kasia herself addressed that issue very well in her testimony when she said, small people, simple people, especially of Hungarian descent, still come into harm's way. It's important, I think, to address that question, especially because the record is not really inconsistent in between Department of State's report and Ms. Kasia's testimony. Ms. Kasia submitted four years' worth of Department of State reports from 98 forward to 2001. Each report addresses the fate and position of Hungarian minority. And in that particular part sounds more or less similar. Department of State reports often recycle the language. All the Department of State actually says is that after the treaty, 1996 treaty between Hungary and Romania, there was a political process in the making to address the violations of the minority rights, including violations of the rights of ethnic Hungarians. That never contradicts instances of individual persecution, and especially because in Tegra Muras, with the biggest Hungarian population, the tension and hostility between Hungarians and Romanians goes way back. This area has seen violent, bloody riots, anti-Hungarian violence in particular. The fact that there is a political party, the fact that Hungarian language is taught in certain universities and schools do not come to show that individually a person such as Tunde Kasia is going to be safe if she goes back. The same policemen, the same local actors may very well still be there. And moreover, Your Honor, even Department of State is still consistent with some possibilities of risk. For example, the report of 2001 shows that if memory serves in Cluj, I think, even in 2001 there were still disturbances, there were still protests about using Hungarian language. So it's important to see how Department of State reports and other country conditions reports are in fact consistent with Ms. Kasia's testimony. For example, Ms. Kasia suffered rape, and I think it's very important, by the way, to mention that the board does not find Ms. Kasia's testimony about rape incredible and did not object to that part of her testimony. That's not really them being reviewed here. We're really reviewing the TV station problem or issue, correct? I realize that. Okay. And going back to that, this court has a long string of precedent decisions that find even more dramatic inconsistencies still forgivable and not going to the heart of the claim. It depends on the facts in those cases here. Of course. And I think we're going around in circles, and I understand your position. It seems to me this does go to the heart of her claim as the basis for her persecution. And so I'm not sure whether it can bear further discussion. I mean, we may have explored all the nuances of it at this point. But anything we haven't covered? I think I may wish to defer a little time. That's fine. You may do that. Rebuttal if the only issue actually before the court is the address and the plausibility of that particular case. That's not the only issue, but the rape is. The whole case is before us, of course, but that's been the focus primarily of the credibility determination. But the rape issue is not. Judge Gould? Let me add. My understanding is that the BIA relied on both the station address and the UDMR coming into the majority coalition. So it seems to me probably at least both those issues are on the table. And under the Wang precedent, if either one of them is supported by substantial evidence, then I think we're bound by it. If I may, Your Honor. Well, an issue of credibility, even though rape in and of itself is not before the court, but it's important to look at the Department of State reports in the part that they do corroborate Ms. Cash's testimony. And all those reports, for example, provide extensive account of persecution and violence against Hungarians and a very specific account of difficulties that victims of rape suffer in Romania where in order to even seek some redress or prosecute this offense, one would need witnesses. So in that part, her testimony has that proverbial ring of truth as far as her experiences go. And with respect to the discrepancies again, we have to look at the long string of the cases that say addresses, dates, even documents often do not serve as enough to find the person incredible, do not qualify as going to the heart of the claim. May I please have the court, Tom Dupree for the United States. I think that to resolve this case, this court need go no further than the contradiction concerning the mailing to the television station. I think that for purpose of this court's review, that should be and really is the beginning and the end of the analysis.  There's a clear contradiction. There's a clear contradiction. There's a clear contradiction between the petitioner's testimony and the documentary evidence concerning the date the television station was created and of course its address. I think it's equally clear that this contradiction does go to the heart of the petitioner's claim. That's all that this court needs to uphold the decision below on the basis of this substantial evidence test. How do you respond to Ms. Cosco's argument that in some cases we've held addresses, phone numbers and dates are inconsequential to go to the heart of asylum? How is this case different or distinguished from those cases? Well, certainly this court, at least to my knowledge, has never enacted a per se rule saying that addresses and dates are irrelevant and for obvious reasons I don't think that such a rule would make sense. I think in the cases to which the petitioner alludes, just generally speaking since I'm not quite clear which ones there are, but let's assume that there are, I think there it's just a question of does it go to the heart of the claim or not. And in this case, this mailing was a central if not the central event in the petitioner's narrative of persecution. This was the mailing that caused her to come to the attention of the Romanian authorities. This was the mailing that was the reason for the authorities taking her into custody and abusing her. So I think it's quite clear that in this particular case, the issue of the television station, the address, does clearly go to the heart of her claim. Well, what if she mailed it? What if she mailed the videotape that's alleged, but it went to a different station at a different street address? Well, if she did, I suppose then that would be consistent, but again, with her overall narrative. But again, I think the point here is that her explanation, namely that the television station was inchoate or was still in the process of being formed, I don't think was an explanation that the IJ was compelled to credit. Possibly a reasonable fact finder could have said, as Your Honor said, well, it was sent to a different station or it was sent to a different address. Could a reasonable fact finder have found that? Perhaps. But, of course, the question is whether the IJ and the board were compelled to accept the petitioner's explanation for what happens. And I think the answer to that is quite clearly no. This is probably as close to a Perry Mason moment as you could get in immigration court, where the petitioner says A and then the other side comes out and says B. I would also point out that if, as the petitioner claimed, the station really was up and running or in some form in 1990 or was at a different address, the petitioner could have explored this or tried to prove it or support her testimony in several different ways. For one thing, she went through redirect after this exchange occurred. For another, there was a nine-day interval between the close of the testimony and the issuance of the decision by the immigration judge, during which the petitioner could have supplemented the record or tried to elaborate on what had really happened. Or, of course, the petitioner could have moved the agency to reopen or to reconsider. Petitioners do that all the time. And certainly nothing was stopping this petitioner from saying, Wait a minute, this really wasn't a contradiction. Here's my evidence showing that this station was operating there, was located at this address during that time. Furthermore, as Judge Schiavelli correctly noted, the Farkas Declaration doesn't corroborate this in any way, shape, or form. That's another way that the petitioner could have corroborated her story, either in the initial affidavit or in a supplemental declaration going to that point. Let me give you the Armageddon approach you're doing from the last case. Let's assume we don't agree on that for the moment, hypothetically. What else would you say supports the IJ's decision here, if anything? Well, I think there's another very strong basis to uphold the agency's decision, and that was the one that Judge Gould noted in his line of questioning, namely the fact that the political party to which the petitioner belongs is now a member of the ruling coalition in Romania. The IJ referred to that in his decision, and then, of course, the board also focused on that point as another basis for upholding it. There's a third point, which the board I don't think expressly alludes to, but the IJ certainly did, which is that the petitioner had left Romania multiple times subsequent to the events of 1990. She went to Hungary several times, and each time returned to Romania. When the government asked her about this during cross-examination, she said, well, and she admitted, yes, she knew that she may have had legal options available to her in Hungary, either pursuing dual citizenship or somehow legalizing her status so that she could stay in Hungary. The IJ, again, wasn't obligated to credit that explanation, and I think that was a very fair interpretation, to say, look, if, in fact, you felt that your life was in danger, how come you kept going to Hungary and kept returning to Romania, not once, but multiple times? Let me come back to the State Department report. In looking at that, while you're correct, it does show the coalition, what about the petitioner's point, and I think there's a fair amount of discussion that corroborates it, that while there may be, at the governmental level, a coalition, there are still, it appears from the report, a good bit of rogue, if you will, police activity as against individuals, which is, I think, the petitioner's point, that while there may be a coalition on the broad scheme of things, I still confront a problem at the individual level, the small people, I think the comment was. And I think that, Judge Schiavone, is a fair reading of what the country report says. I do think there are reports either of isolated or, for lack of a better word, small-scale incidents of harassment, and so I think it would be going a little far to say that the petitioner's claim is foreclosed by the country conditions report, but in fairness, I don't think that's how the IJ or the agency for that, the BIA for that matter, treated the country conditions report. I think they properly regarded it really as a supplemental reason for the holding, what was in the country conditions report, saying that there are all sorts of credibility problems, and in addition, we note that the country report certainly doesn't support the petitioner. While it may not foreclose her claims, it certainly is at least in some tension with her arguments. Unless there are further questions from the court. No, thank you. Sir, thank you. I'm here. No questions here. You had some. Time for rebuttal. Yes. Thank you, Your Honor. Very quickly, as far as her ability to resettle elsewhere, this issue was not before the board. The board did not address it. It does not go to the ‑‑ it's not being considered here either. As far as ‑‑ You're correct. The immigration judge referenced it, but it's not referenced in the BIA, so it's not something that's up for review by us. And as far as the question of did she send the tape, I'd like to say three things. This may not be and should not be the only question before this court. She is a Hungarian woman who's been politically active with a party that now seems to gain politically but wasn't even formed until 1996. She and her husband attempted to defect from then communist Romania in 1976, and that's when they first came into the eyes of the local authorities. She then became involved in the events of 1990 in relation to the Hungarian‑Romanian conflicts, and then she testified very credibly that after the treaty was signed, from 1996 all the way until 2000, she gradually began being once again more active politically and that ultimately the final event that made her consider fleeing her homeland actually came about in the year 2000. The judge is compelled to consider all of those instances and the whole of her testimony. But isn't that a two‑edged sword? She had tried to defect, she had been politically active in the Hungarian movement to gain rights, but there isn't a great deal of testimony of any harassment during that entire period until we get up to the events that are described here. This is correct, Your Honor. There isn't a great deal of testimony. We have the record as we find it, but still we see the long history of someone who didn't have any safety or protection in her homeland. But in the last 24 seconds, what's important for me is she can't seem to get it right. If the sending of the tape is that important, then why her counsel was not given an opportunity to comment on this event at the hearing, in the immigration court hearing? I think that problem turns a no, you cannot object, you cannot comment, you only must object. And that in an administrative hearing, an impermissible technicality, if that eventually results in taking ‑‑ Has there ever been any attempt to supplement the testimony, to supplement the evidence in any way to show there was another station or that the tape was sent elsewhere? Your Honor, I see that in the record the previous counsel, Ms. Kasha's counsel, actually submitted along with his BIA's brief, he submitted a motion to remand. And along with this motion, he submitted his own declaration, which is admittedly not evidence, but at least a fair attempt to address this issue. If this is a seminal issue, she at the very least deserves an opportunity to clarify it. Although quite contradictory, but that happens, I don't think it has to be the seminal issue. There is plenty there. Thank you for your argument, thank both of you. The case just argued, Cosco v. Mukasey, is submitted. We'll next hear argument in Pannenbecker v. Liberty Life Assurance.
judges: McKeown, Gould, Schiavelli